FILED

IN THE UNITED STATES DISTRICT COURT

MAR 1 7 2023

WESTERN DISTRICT OF TEXAS

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY _____
DEPUTY CLERK

| | |
|---|---|
| VINCE CHETTY, DENISE CHETTY; and ANGELA GOVENDER, <br><br> Plaintiffs, <br><br> v. <br><br> US MF LC RESIDENCES, LLC., ZRS MANAGEMENT, LLC., ERIC DELEON, MARIO ESQUIVEL, ALADDIN ENVIRONMENTAL, INC., JOHN SPALTEN, BRITTANY GREEN, ALLSTATE INDEMNITY COMPANY, AND LESLIE FIELDS, <br><br> Defendants. | SA23CA0344 XR <br><br> Case No. _____ |

DEMAND FOR JURY TRIAL

## COMPLAINT

We, Vince Chetty (hereunder referred to as "Plaintiff 1"), Denise Chetty (hereunder referred to as "Plaintiff 2"), and Angela Govender (hereunder referred to as "Plaintiff 3" and jointly as "Plaintiffs"), acting pro se, hereby file this Complaint against, US MF LC Residences, LLC.(hereunder referred to as "Defendant 1"), ZRS Management, LLC., (hereunder referred to as "Defendant 2"),  Global Restoration, a sole proprietor, owned by Eric De Leon (hereunder referred to as "Defendant 3"), Global Restoration employee, Mario Esquivel (hereunder referred to as "Defendant 4"), Aladdin Environmental, LLC., (hereunder referred to as "Defendant 5"), John Spalten, (hereunder referred to as "Defendant 6"), Brittany Green (hereunder referred to as "Defendant 7"), Allstate Indemnity Company (hereunder referred to as "Defendant 8"), and Leslie Fields an Allstate Adjuster (hereunder referred to as "Defendant  9" ) in the above-styled matter and state as follows:

1. This is a civil action for damages arising from the Defendants' gross negligence, breach of contract, intentional infliction of injury, negligent infliction of emotional stress, defamation, violation of the Texas Property Code, and violation of the Texas Insurance Code, Title 5, Subtitle C, Chapter 541, and Sec 541.060 (a) 1, 2 A and B, and 3, 7.

2. The Plaintiffs were tenants at three apartments that are subject to this complaint located in the apartment complex called, The Residences at La Cantera (hereunder referred to as "The Residences"), located at 6215 Via La Cantera, San Antonio, TX 78256. Apartment Number 131 (hereunder referred to as "Apartment 1") is a two-bedroom, two-bathroom apartment, Apartment Number 301 (hereunder referred to as "Apartment 2") is a one-bedroom, two-bathroom

fully furnished model apartment, and Apartment Number 306 (hereunder referred to as "Apartment 3") is a two-bedroom, two-bathroom fully furnished model apartment.

3. The Residences is owned by Defendant 1 located at 9830 Colonnade Blvd., Suite 600, San Antonio, Texas 78230.

4. The Residences is managed by Defendant 2, headquartered at 2001 Summit Park Drive, Suite 300, Orlando, FL 32810, with a regional office at 1909 Woodall Rodgers Freeway, Suite 400, Dallas, TX 75201.

5. Remediation and restoration work was performed by Defendant 4 who was employed by Defendant 3 who operates a business called Global Restoration Services, located at 10903 Wye Dr., San Antonio, Texas 78217

6. Mold Testing of Apartment 1 was done by Defendant 5 and Defendant 6 for Defendant 1 and Defendant 2, located at 321 W. Josephine, San Antonio, Texas 78212.

7. Alleged Defamatory actions were taken by Defendant 7 who is/was the Regional Manager for Defendant 2.

8. Defendant 8, Allstate Indemnity Company is the insurance company responsible for providing the Renters Insurance to the Plaintiffs. Their home office is located at 2775 Sanders Road, North Plaza, Northbrook, IL 60062, and their National Claims Center list a mailing address of P.O Box 672041, Dallas, TX 75267. The agent for the service of process is CT Corporation Systems, located at,1999 Bryan St., Ste. 900, Dallas, TX 75201-3136.

9. Defendant 9, Leslie Fields is Defendants 8's claims adjuster. She works at the Allstate National Claims Center and according to her supervisor, Sandy Burns, the agent for service of process for her is also CT Corporation Systems, 1999 Bryan St., Ste. 900, Dallas, TX 75201-3136.

10. The Plaintiffs are long-term residents of Texas and citizens of the United States. Their physical address is 2725 Arbor Edge Crossing La Marque, Texas 77568.

11. Defendant 1 was responsible for the residential rental lease agreement. The Plaintiffs entered into a lease agreement with Defendant 1 on September 1, 2021, with an end date of September 5, 2022, to rent Apartment 1.

12. Defendant 2 managed the Residences for Defendant 1 and employed, Shelly Trevino as the Residences Property Manager, located at the Residences, Debra Porter as the Regional Manager, Lori Wheeler, as the Regional Vice President, and Brittany Green (Defendant 7), as the Regional Property Manager, located at the regional office in Dallas, Texas.

13. Defendant 4 performed moisture testing and mold remediation at Apartment 1 at the direction of Defendant 3.

14. Defendant 5 is a Mold Testing limited liability corporation and Defendant 6 is the sole member of the corporation and the licensed mold inspector of Defendant 5.

15. Defendant 7, is described in 7 above.

16. Defendant 8 sold the Plaintiffs a Renters Policy which amongst other things covered the Plaintiffs' personal property against damage due to water and mold and provides additional living expenses if the apartment became uninhabitable due to a covered loss.

17. Defendant 9 was responsible for dealing with Plaintiff's insurance claim.

18. Defendants are jointly and severally liable for all acts alleged herein.

## JURISDICTION

19. The Court is a proper court for trial in this action of the Defendants as alleged herein, have their operations within the Court's jurisdiction.

20. Venue is proper in this district under 28 U.S.C. § 1391(b) because the events giving rise to the Plaintiffs' claims occurred in this district, and Defendants are located and transact business in this district.

21. The Plaintiffs commences this action timely and in accordance with any applicable statutes of limitations.

## I. INTRODUCTION

22. This complaint is brought against the Defendants for violating the provisions under the Texas Property Code Title 8 Chapter 92 Subtitle A, Sec 541.060 (a) 1, 2 A and B, and 3, 7 of the Texas Insurance Code, Title 5, Subtitle C, Chapter 541 and consequently violating the Plaintiffs' rights.

## II. FACTS

23. The Plaintiffs were tenants of Apartment 1 and Apartment 3 which is subject to this Complaint.

24. On March 23, 2022, Plaintiff 1 informed Defendant 1 and 2 that there was water on the carpet in Apartment 1's main bedroom. Defendants 1 and 2 did not properly remediate the damage. Plaintiff 1 informed Defendant 1 and 2 in an e-mail that they would be held responsible for injury to the Plaintiffs due to said improper remediation.

25. Plaintiff 1 and Plaintiff 2 found stagnant water in the master closet on April 3, 2022, which occurred on March 23, 2022. The water damaged Plaintiff 1 and Plaintiff 2's personal property. Plaintiff 1 informed Defendant 1 and 2 who started a second remediation. Plaintiff 1 filed a claim with Defendant 8.

26. On March 25, 2022, Plaintiff 2 complained to Roger Hernandez, a leasing agent, at the leasing office of The Residences about the improper work done at

Apartment 1. Later that evening Plaintiff 2 sent Roger Hernandez an email and asked him to forward it to Shelly Trevino, the Manager of The Residences, and Defendant 1, wherein she explained that Roberto, the Maintenance Manager, and his maintenance crew did not do a proper water remediation job. They placed a small noisy and ineffective fan in the bedroom. The Plaintiffs asked for proper remediation and to be relocated during the remediation. Plaintiff 2 warned Roger Hernandez, Shelly Trevino, and Defendant 1 that if in the future Plaintiffs suffered from any effects of the water damage, Defendants 1 and 2 would be held responsible for damages. They did not respond.

27. On March 26, 2022, Roberto of maintenance, replaced, the small fan with a larger less noisy fan. The fan ran for a few days and was taken away and the hole that was made in the wall was repaired.

28. On April 3, 2022, 11 days after the initial leak, Plaintiffs 1 and 2 decided to clean out their closet, since they were going to entertain some overseas family. During the cleaning, they discovered that the closet floor was wet and personal property stored on the floor and hanging clothing that was touching the floor were wet, smelly, and some of it was covered in a black substance. They immediately removed, photographed, and bagged up the items. They moved some items that they thought were not damaged to their 300 square feet storage at Extra Space Storage, located at 7363 N, Loop 1604, San Antonio, Texas. The storage also contained other furniture, clothing, and personal items. Plaintiff 1 filed a claim with a claims representative of Defendant 8 and advised her that the clothing was making the Plaintiffs sick. The claims representative advised Plaintiff 1 to photograph and discard the offending items. The claims representative did not sound authoritative since she said that she was not the homeowner's property claims representative and that a homeowner's claims

representative will get in touch with Plaintiff 1 the next day. Plaintiff 1 decided against discarding the damaged property altogether due to the claims representative not being the homeowner's claim representative.

29. The Plaintiffs photographed the water-damaged items and that evening started uploading them to Defendant 8 Claims Site. The plaintiffs bagged up the damaged items and removed them to the living room.

30. That night, Plaintiff 1 could not breathe, suffered a fever, and coughed up blood. He described that it felt like he was dying.

31. On the morning of April 4, 2022, Plaintiff 1 visited his doctor. The doctor prescribed medication. Defendant 9 called Plaintiff 1 to discuss the claim. Plaintiff 1 told Defendant 2 that he was at the doctor's office because the wet clothes that he handled the day before made him very ill, to the point that he felt like he was dying. During this call or in a subsequent call, Defendant 2 told him that mold was not covered for any reason. She quoted part of the mold exclusion in the policy and failed to continue reading the exception to the mold exclusion. She asked where the water had come from and Plaintiff 1 told her that the carpet was wet and that the water had come from a broken faucet in the maintenance room. She said that it seemed like it was groundwater, Plaintiff 1 told her absolutely not, it was not groundwater and in fact, that her conclusion was nonsensical. Plaintiff 1 told her to speak to the manager of the apartment and ask her exactly from which faucet the water leaked since he was unsure about the location of the faucet. She asked for the manager's telephone number and Plaintiff 1 asked her to Google it since he was in the doctor's office. She said she would call the apartment and ended the call. Throughout the call, she was rude, abrupt, and condescending and just seemed bent on denying the claim.

32. The Plaintiffs tested negative for Covid. Plaintiff 2 asked Shelly Trevino to use the model apartment while remediation was being done but she refused and advised Plaintiff 2 to seek assistance from Defendant 8. Plaintiff 2 told Shelly Trevino that Defendant 8 and Defendant 9 refused mold and additional living expense coverage. They met in her office, spoke over the phone, and sent emails asking to be relocated but Shelly Trevino flatly refused to allow them to use the model. She instead focused more on technicality stating that Plaintiff 1 and Plaintiff 3 were not listed on the lease.

33. Shelly Trevino sent Roberto who peeled back the carpet. Plaintiff 1 went in and took photographs of the blackened baseboard. Roberto came back and wiped off the black mold on the baseboards with bleach, and later brought a fan and took the carpet away to wash and dry.

34. On April 5, 2022, Plaintiff 2 started complaining about the same things that Plaintiff 1 had the day before. Plaintiff 1 looked at the insurance claim on Defendant 8's website and noticed that the status was changed to closed. Plaintiff 1 was very anxious since he thought that Defendant 9 denied the claim because Plaintiff 1 did not provide the apartment manager's telephone number. Plaintiff 1 could not sleep that night and called Defendant 9 the next morning to enquire why the claim was closed and to explain that he had discovered that the leak had come from a broken faucet in the vacant adjacent apartment.

35. Defendant 9 told Plaintiff 1 that she closed the claim because the cause was groundwater which was not covered. Plaintiff 1 explained that the cause was a broken faucet and Defendant 9 said that she was re-opening the claim. She asked Plaintiff 1 to wash the clothes and Plaintiff 1 explained that the moldy clothes were making him sick and that he was not willing to handle them again.

She told Plaintiff 1 to keep the damaged items and that she was going to send out her vendors to assess and possibly remediate the damaged items.

36. Plaintiff 1 kept the damaged items in the living room but it was making the Plaintiffs very ill. Plaintiff 1 got an email to rate Defendant 9's performance, Plaintiff 1 gave her one star and commented on her rudeness and lack of empathy. He also sent her an email asking how long was she going to expose the Plaintiffs to these items that were making them sick and when was she going to send out the vendors to remediate and/or discard the items.

37. On April 6, 2022, Plaintiff 1 once again pleaded with Defendant 8 and Defendant 9 for mold coverage but they re-confirmed that it was not covered under any circumstances. The Plaintiffs conveyed this to Defendants 1 and 2 but they continued to refuse the use of the model apartment. Plaintiff 2 saw her doctor with the same symptoms as Plaintiff 1 and was also given medication to relieve the symptoms. Samples of body fluid were taken for further testing. The Plaintiffs were very ill, Defendant 1 and/or Defendant 2 did not want to help out with accommodation and Defendant 9 decided not to send out anyone to inspect the mold situation, so Plaintiff 1 decided to do a mold test to try and figure out what was causing the Plaintiffs' illness. Plaintiff 1 called Clean Environments, Inc. to do a test. Clean Environment Inc. is a mold testing company that usually does work for insurance companies. Plaintiff 1 sent an email to Defendant 9 reconfirming their discussion on Apr 4th, 2022 that the Plaintiffs believed that they were being mold poisoned by the clothes they handled. During an incoming, 4 minute and 53 second phone call, from a number ending in 7100, Defendant 9 informed Plaintiff 1 that the policy stated that mold was not covered under any circumstances. Plaintiff 1 asked her even

if it resulted from a faucet leak from the adjacent apartment. She once again confirmed it was not covered under any circumstances.

38. On April 7, 2022, Craig Nelson, a licensed mold inspector from Clean Environments, Inc. performed mold air sampling of Apartment 1's master bedroom, master closet, and the outside. Craig Nelson recorded that Plaintiff 1 saw black mold on the baseboards in the master closet and that Roberto of maintenance wiped it off with bleach.

39. On April 11, 2022, the Plaintiffs received the results of the mold tests. The main concern was the presence of Stachybotrys Chartarum (also known as Black Mold) in the Master Closet and the extremely high levels of Penicillium/Aspergillus in the Master Closet which was 7530 spores per cubic meter of air, the Master Bedroom was 429 Spores per cubic meter of air and the outside baseline reading was 247 spores per cubic meter of air. The report explained that many varieties of Penicillium and Aspergillus produce toxic substances that are associated with symptoms such as sinusitis, allergic bronchopulmonary aspergillosis, allergic reactions, mucus membrane irritation, headaches, vomiting, and diarrhea. Stachybotrys fungal spore toxins result in cold and flu symptoms, sore throat, diarrhea, headaches, fatigue, dermatitis, intermittent local hair loss, generalized malaise, cough, rhinitis, nosebleeds, a burning sensation in the nasal passages, throat, and lungs, fever, suppresses immune system affecting the lymphoid tissue and bone marrow, necrosis, hemorrhage within the brain, thymus, spleen, intestine, lung, heart, lymph node, liver and kidney and pneumocystis. It is rare to find Stachybotrys spores in the air unless the fungi are physically disturbed. The Plaintiffs were suffering from many of these symptoms.

40. On the morning of April 11, 2022, Plaintiff 1 and 2 went to the leasing office and gave Shelly Trevino the mold report and memorialized the meeting in an email wherein she explained that 95% of the master closet and 59% of the main bedroom's air was infected with dangerous mold. She explained that the Plaintiffs were suffering serious medical problems due to the mold. Shelly Trevino said that she would be sending out her own vendors to investigate the mold issue. Stating that they only believed in a moisture test.

41. On April 12, 2022, Plaintiff 1 had a 19 minute and 19 second call with Defendant 9 , and probably explained the dangerous situation with the mold.

42. On April 13, 2022, Defendants 1 and 2 sent out Defendant 4 who did a moisture test and found high levels of moisture in the master bedroom and master closet.

43. Defendants 1 and 2 said Defendant 4 was going to open up the walls in the master bedroom and closet on April 18, 2022, to inspect for mold. Defendants 3 and 4 were not licensed to do mold inspections or remediation.

44. Once again, the Plaintiffs pleaded with Shelly Trevino to be relocated to the furnished model apartment. She refused, restating that the Plaintiffs needed to go through their renter's insurance. Plaintiff 1 spoke to Defendant 9 about mold coverage and she said that she had consulted with her supervisor and that they both agreed that mold was not covered under any circumstances.

45. On April 14, 2022, Plaintiffs 1 and 2 continued pleading with and begging Shelly Trevino to relocate them. The email exchanges between Plaintiff 2 and Shelly Trevino show Shelly Trevino at first being unresponsive, dismissive, and unconcern about the allegation of discrimination and the fact that Plaintiff 2 was a cancer survivor and that the Plaintiffs were now very sick. Shelly Trevino just replied that she spoke to her supervisor and that the supervisor said that the Plaintiffs should contact their insurance company.

46. On April 17, 2022, the Plaintiffs were forced to miss their planned trip to Miami with their overseas relatives. They had non-refundable tickets and accommodation. Defendant 4 contacted Craig Nelson and asked him to interpret his mold test results. Craig Nelson explained that the mold counts were very high, that the Plaintiffs should move out, and that a mold remediation plan should be followed to investigate and clean up the mold.

47. On April 18, 2022, Defendant 4 came to Apartment 1 and opened up the master bedroom wall. Plaintiff 1 told Defendant 4 to call him after he had opened the wall and before he did any remediation. Defendant 4 called Plaintiff 1 and stated that there was no visible mold inside the bedroom wall. Plaintiff 1 could not confirm his observations since everything was covered in white dust from the use of an electric saw. Defendant 4 sprayed the master bedroom frame with Bulls Eye 1.2.3 Pro which was very toxic to the Plaintiffs. Defendant 4 opened the Master Closet walls and only called Plaintiff 2 to look at the frame after he had sprayed it with Bulls Eye 1.2.3 Pro. It seemed to Plaintiff 2 that Defendant 4 found black mold in the closet and sprayed Bulls Eye 1.2.3 Pro to cover it up. Plaintiff 1 noticed that the backs of the exposed sheetrock were black when Defendant 4 and his crew carried the unfastened drywall out of the apartment. Defendant 4 did not follow any of Craig Nelson's recommendations. Defendants 3 and 4 were not licensed to carry out mold inspections and/or remediation.

48. Due to the Bulls Eye 1.2.3 Pro spray, the room became very toxic for Plaintiffs 1 and 2 and they could not sleep in it for a few days. They slept on the couch in the living room. Plaintiffs 1 and 2 kept pleading with Shelly Trevino and Debra Porter to accommodate them in the model apartment but they refused to do so. There were back-and-forth emails that show that the Plaintiffs asked for help to be relocated and Shelly Trevino kept insisting that the Plaintiffs get help from

their Insurance Company even after being told many times that the insurance company refused the mold claim.

49. On April 20, 2022, Plaintiff 1 requested the policy jacket from Defendant 8 and read the policy, and discovered that there was an exception to the exclusion of mold, it said that the policy covered Plaintiffs up to $5,000.00 for mold remediation, Plaintiff 1 uploaded the mold report to the Defendant 8's claims website and sent a message to Defendant 9 citing the page number and line and asking her for Mold Remediation and Additional Living Expense while this was happening. She did not respond. Plaintiff 1 was still concerned because the claim still showed up as closed even after leaving Defendant 9 a few messages and emailing her. Defendant 9 said that the claim was open but left it closed on Defendant 8's claim's website. It only showed open status around Apr 20, 2022. This also stressed the Plaintiffs out a lot, since The Plaintiffs felt that Defendant 9 was in a power play to show them who was boss.

50. Plaintiff 1 and Plaintiff 2 called Defendant 9 twice on April 21, 2022, and asked for mold coverage. Defendant 9 called Plaintiff 1 back at 4.43 PM on April 21, 2022, from telephone number (443)565-7100 and now admitted that the policy did in fact cover mold remediation. She said that if the Plaintiffs wanted to file the claim under mold remediation, Defendant 8 would only cover up to $5,000.00 and the water-damaged items and mold will be subject to the limit of $5,000.00.

51. The water-damaged items claim was for $9,123.75. So, in effect, this would reduce the Plaintiffs' claim to only $5,000.00 if the Plaintiffs claimed for mold. Plaintiff 1 confirmed with Defendant 9 citing the amounts, since amounts are unambiguous, Defendant 9 confirmed the amount of $5,000.00. Plaintiff 1 asked her a hypothetical if a property was damaged by fire and by the fire

department's water, would she only cover the fire and not the water damage? Defendant 9 once again reiterated that the limit will be reduced to $5,000.00. Plaintiff 1 did not want to argue with Defendant 9 since she had already shown that she was capable of arbitrarily closing the claim.

52. The Plaintiffs were in a catch-22 situation, Defendant 1 and Defendant 2 did not want to provide alternative accommodation, and Defendant 8 and Defendant 9 were threatening to reduce the entire claim to $5,000.00 if the Plaintiffs wanted to file a mold claim.

53. On April 27, 2022, the Plaintiffs were very ill and decided to contact Craig Nelson of Clean Environments and were advised to do another test. The test was done. Defendant 9 paid out $5,240.11 for the water-damaged property.

54. On May 2, 2022, the Plaintiffs received an extremely shocking mold report from Craig Nelson. Plaintiff 2 sent the report and an email to Shelly Trevino and Debra Porter. The Aspergillus/Penicillium levels were now almost twelve times more than the first test. It was 89900 spores per cubic meter of air in the Master Closet and 728 spores per cubic meter of air, outside. All the occupants and the dog were now ill. Craig Nelson reported that the only way for the spore to exponentially increase at this level is through disturbance of mold-damaged building materials, which was most likely done by Defendant 4 opening up the sheetrock wall cavities in the Master Bedroom and Master Closet. Craig Nelson made four recommendations which Defendants 1 and 2 did not want to accept. In the email, Plaintiff 1 explained that Defendant 4 had not performed the work properly and caused more damage and injury. Plaintiffs once again asked to be relocated to the model apartment. Plaintiff 2 was so concerned about their health that she asked Shelly Trevino to call her son to let him know if the plaintiffs died in Apartment 1. Shelly Trevino did not answer until Plaintiff 2 sent

her a second notice. Shelly Trevino did not want to let the Plaintiffs use the model apartment but offered to release the Plaintiffs from the lease with a thirty-day notice.

55. On May 6, 2022, Plaintiff 2 sent Shelly Trevino an email with the second mold report showing that Defendants 1 and 2 did not address their mold problem and in fact, they made it about twelve times worse. She complained that Defendants 1 and 2 were placing an extreme burden on the Plaintiffs by giving them only one option to move out. She said that the Plaintiffs had made plans to move out at lease end of September 5, 2022, and moving out earlier would have placed extreme financial strain on the Plaintiffs. She informed Defendants 1 and 2 that there should be no dispute about Plaintiffs 1 and 3 tenancies since the paperwork was filled out and money was paid to add them to the lease.

56. On May 16, 2022, Shelly Trevino did not respond to the first email, so Plaintiff 2 sent her a second email.

57. On May 17, 2022, Plaintiff 2, spoke to a functional medicine practitioner, who specializes in mold. The initial report has a long list of symptoms of Chronic Inflammatory Response Syndrome and subsequent biochemical and genetic lab tests all prove positive for Chronic Inflammatory Response Syndrome. Plaintiff 2 was now more anxious than ever and sent Shelly Trevino a third email notice and a fourth email notice after speaking to the medical practitioner, wherein she explains that she was diagnosed with Chronic Inflammatory Response Syndrome and that she could only start treatment after she moved out of Apartment 1. It was only after Plaintiff 2 threatened to contact the media and local news agencies that Debra Porter, the Regional Manager of Defendant 2 emailed Plaintiff 2, stating that she inspected the apartment with two other contractors and did not see what the Plaintiffs were reporting. She said that she

was willing to have a certified Mold Consultant come out and do a full inspection. This inspection would be completed by a Texas Licensed Mold Consultant who would take all matters into consideration including the manner in which the unit was air-conditioned. The cost of this inspection was to be $1,365.00 Should an irregularity be found; the property will assume the inspection expense and complete the repairs identified as being needed. However, if there were no irregularities found, this expense would be billed to Plaintiff 2's account. Plaintiff 2 responded that she was not willing to waive her rights and pay for the mold inspection under any circumstances. Plaintiff 2 told Debra Porter that the best solution would be to relocate the Plaintiffs while they did test and remediation. Plaintiff 2 also warned Debra Porter that by forcing the Plaintiffs to continue living in Apartment 1 and exposing them to dangerous mold she was increasing the Liability for Defendant 1 and 2. Debra Porter responded by stating that she was not present and could not confirm where the mold samples or inspections were taken. She said that she would be happy to review the reports and get an affidavit from Craig Nelson to determine where the samples were taken and confirm their licensing. She said that once she received the reporting and completed the additional due diligence, she will inform Plaintiff 2 of their next step. Plaintiff 2 responded to her email by reiterating the entire history of events in order to make her understand the Plaintiffs' dire situation. Debra Porter also decided to ignore all the issues facing the Plaintiffs

58. On May 18, 2022, Debra Porter emailed Plaintiff 2, saying that she was looking at two vendors to make a decision on her next step and would be in contact later. That evening she told Plaintiff 2 that she scheduled a contractor, Defendant 5 to air-test the apartment the following day.

59. On May 19, 2022, Debra Porter sent Defendant 5 to perform a mold air test. Defendant 5 arrived and asked Plaintiff 1, where the leak had occurred, Plaintiff 1 pointed out the Master Bedroom, and Defendant 5 apparently did the test in the Master Bedroom, the Master Closet, the Kitchen/Living Room, and the Outside.

60. On or before May 20, 2022, probably on May 18, 2022, Plaintiff 1 called to speak to Defendant 9, she was not available, so Plaintiff 1 asked to speak to Defendant 9's supervisor. He was connected to her supervisor Sandra Burns. He told Sandra Burns that he had asked Defendant 9 about mold coverage and that Defendant 9 on many occasions stated that mold was absolutely not covered, when confronted with the truth, she attempted to settle the mold claim with the water damage claim.

61. Sandra Burns agreed that there was a separate coverage for mold and said that she would look into the matter and speak to Defendant 9. Defendant 9 made a payment of $2,112.21 on May 20, 2022, for Additional Living Expenses due to mold for Plaintiff 1 and Plaintiff 2. Plaintiff 1 enquired why no payment was made for Plaintiff 3, Sandra Burns relented and got Defendant 9 to pay out another $2,112.21 on May 25, 2022, for Additional Living Expenses for Plaintiff 3. She made a payment of $775.58 for mold testing after which the policy reached the limit for Mold, namely $5,000.00.

62. On May 23, 2022, Debra Porter sent Plaintiff 1 the results of the May 19, 2022, inspection. The outside baseline result for Penicillium/Aspergillus was 440 spores per cubic meter of air, the Master Closet was 200 spores per cubic meter of air, the Master Bedroom was 920 spores per cubic meter of air and the Kitchen/Living Area was 120 spores per cubic meter of air. The results were significantly lower than the Plaintiff's test of Apr 28, 2022, so Plaintiff 2 sent

Defendants 5 and 6's report of May,19 to their mold tester, Craig Nelson. Craig

Nelson said that either his test from April 28, 2022, was wrong or Defendant 5

and 6 test of May 19, 2022, was wrong. He said that both of them cannot be

correct. He was also surprised at a lower spore count in the most affected area,

namely the closet, and a higher level in the master bedroom. The Report had

the address of The Residences and did not have the address of Apartment 1.

The Report did not have the time the sample was taken and when it was handed

over to the lab. Debra Porter said that she was advised to change the carpet in

the closet and independently decided to change the carpet in the bedroom to

tile. She offered Plaintiff 2 the one-bedroom model to use, which Plaintiff 2

accepted with reservation since they needed two bedrooms to accommodate

Plaintiff 3. Plaintiffs 1 and 2 felt much better in Apartment 2 but Plaintiff 3

continued to live and suffer the effects of mold in Apartment 1.

63. On May 20, 2021, Defendant 8 finally agreed that Mold was covered up to a

maximum of $5,000.00 and paid out the total over the following days to

retroactively cover additional living expenses and some environmental testing.

64. On May 24, 2022, Rasa Floors installed tile in the master bedroom and master

closet of Apartment 1 and Shelly Trevino gave Plaintiff 2 the key to Apartment

2

65. On May 31, 2022, Plaintiff 1 asked for new mold testing to determine if it would

be safe for them to return and sleep in the master bedroom. The master

bedroom was kept closed from May 24, 2022, to mitigate more damage to

Plaintiff 3. The retest was scheduled for June 1, 2022, at 10.30 AM. Plaintiff 1

did not trust Defendant 5 and 6 results, he called Craig Nelson and asked him

to come in at the same time to perform the same test as Defendant 6.

66. On June 1, 2022, both of them came in and performed the same test at the same time and in at least three of the same areas.

67. On June 3, 2022, Plaintiff 2 sent an email to Debra Porter, stating that the situation had gotten worse after the carpet removal and installation of the tile flooring. Plaintiff 3, who was still in Apartment 1 was now more ill than ever. Plaintiff 2 was concerned that the weekend was coming up and she did not want Plaintiff 3 to sleep another night in Apartment 1. Plaintiff 2 asked Debra Porter if she had received the results of the test done by Defendant 6 and appealed to her to do something to help them. Debra Porter responded by visiting the Plaintiffs at the apartment at 3.30 PM. She said that she could not give them the two-bedroom apartment because Plaintiff 1 and Plaintiff 3 were not on the lease. Plaintiff 2 sent her an email which was received on April 12, 2022, from Crossfire on behalf of The Residences, showing that all three of them were on the lease. After seeing the above confirmation email and researching it, she believed Plaintiff's claim, came back at about 5 PM, did not want to enter Apartment 1, and seemed extremely worried and told Plaintiff 1 that they rekeyed the 2-bedroom model to match Plaintiff's key of Apartment 1. She told Plaintiff 1 and Plaintiff 2 that the counts were very high and advised them to immediately move to model Apartment 3, which they did. At about the same time, the Plaintiffs received their results from Craig Nelson who was now very concerned about the high levels of Chaetomium in the Master Closet, Master Bedroom, and Bedroom 2 where Plaintiff 3 slept. The levels of Penicillium/Aspergillus were extremely high but not as high as in his second report. The Plaintiffs were promised that the Defendants 1 and 2 test results will be given to them soon but Debra Porter and/or Shelly Trevino did not send them despite numerous requests from the Plaintiffs. They just said that the count was

significantly higher and the same as the Plaintiffs' own test. The Plaintiffs moved out of Apartment 1 and into Apartment 3.

68. On June 6, 2022, Debra Porter sent Plaintiff 2 an email stating that with the new report that Defendants 1 and 2 needed possession of Apartment 1 in order to take the time necessary to make repairs. She offered $1,500.00 in moving expenses. In addition, she offered to transfer the Plaintiffs to another unit onside or be released from the lease. The Plaintiffs had till Monday, June 13, 2022, to make a decision but had Apartment 3 as their living quarters until Sunday, June 12, 2022. The email did not make sense.

69. On June 8, 2022, Plaintiff 2 sent Debra Porter an email explaining that she had not looked at her email and was ill from clearing out Apartment 1. She explained that there was not sufficient time to get the remediation company to come out and remediate their personal property. She said that she needed more time since was also still not well, did not have the energy to do anything, and was forgetting a lot. She asked her to allow Plaintiff 1 to deal with the problem.

70. On June 10, 2022, Plaintiff 1 spoke to Debra Porter and she said that she was concerned about their living in the model since the model was not comfortable accommodation. She said that she could arrange for the Plaintiffs to live off-site in a more comfortable furnished apartment or they could continue living in Apartment 3 or they could move out whenever they wanted. Plaintiff 1 asked if she could do the offsite accommodation in Houston since they were looking to move to Houston. She said that she could give them an allowance of $4,000.00 which they could use in Houston. Debra Porter told them that they needed to put the request in writing and email it to her. It felt strange that she was the one that suggested the Plaintiffs move and then asked them to send the request. Plaintiff 1 acceded to her request.

71. In subsequent emails, Debra Porter made it seem like Plaintiff 1 requested $4,000.00 to move out and that she was waiting to get approval from management.

72. On June 14, 2022, Plaintiff 2 sent an email to Debra Porter to show that she had made an offer to the Plaintiffs and stated that she accepted Debra Porter's offer of $4,000.00 for a short-term rental in Houston. She offered to be out of the Apartments by Friday, June 17, 2022.

73. On June 17, 2022, Debra Porter sent Plaintiff 2 an email with a Release of Liability. The release was not a release from the lease as she expected but instead a release of liability from the handling of the mold issue.

74. On June 18, 2022, Plaintiff 1 replied to Debra and summarized all the previous events and stated that he believed that this was a bait and switch to get the Plaintiffs to sign away all their rights in a comprehensive Release of Liability. As a result of this, Plaintiff 1 believe that it was best that they revert to the terms of the lease and communicate strictly according to the terms of the lease, and if any concessions were made, they must be made in the Plaintiffs' favor. Plaintiff 1 asked that she make sure to follow the delivery method for communication stipulated in the lease and to reference the section or sections in the lease when making any decisions affecting their rights and obligations. The Plaintiffs and Debra Porter reached a stalemate in their negotiations.

75. On June 20, 2022, Debra Porter met Plaintiff 2 in the lobby of the Residences and she asked her what the Plaintiffs intended to do. Plaintiff 1 spoke to Debra Porter and told her that the ball was in their court and they needed to tell the Plaintiffs what they wanted to do. Plaintiff 1 believed that he was still exercising Debra's first option of staying in Apartment 3 until the lease ended.

76. On June 21, 2022, Plaintiff 2 started treatment for mold since her lab results showed that she had Chronic Inflammatory Response Syndrome, and the HLA gene that responds to dangerous mold was switched on by the mold infection.

77. On June 22, 2022, Plaintiff 2 sent another email to Debra Porter requesting the mold report and enquiring about their living situation but Debra did not respond.

78. Defendant 9 made the final payment of $3,633.64 on June 24, 2022, after she received receipts for items purchased to satisfy the Replacement Cost Rule, that items have to be purchased to get a full replacement. This ended that part of the claim.

79. On June 30, 2022, Plaintiff 1 sent an email to Debra Porter again asking for clarification on their living situation, explaining the difficulty with getting internet and requesting a copy of the post-remediation test, of June 1, 2022. He explained that they were concerned about what they were breathing in and needed the report for their doctor. He also asked her to approve moving the internet from Apartment 1 to Apartment 3. She did not respond.

80. On July 1, 2022, Plaintiffs 1 and 2 spoke to Kevin at the leasing office of The Residences and he told them that they didn't know anything about the Plaintiffs' living situation and were instructed not to speak to the Plaintiffs about anything. They told Kevin that they intended to move out at the end of their lease and wanted to give their sixty-day notice. He advised them how to do it and Plaintiff 1 sent them an email with the notice.

81. On July 8, 2022, the Plaintiffs fully vacated Apartment 1 and disposed of all of their personal property. They had no communication with anyone, until July 11, 2022.

82. On July 11, 2022, Lori Wheeler, the Regional Vice President of Defendant 2 sent Plaintiff 2 an email stating Debra Porter had a medical emergency and

wanted to know about the status of their residency in Apartment 3 and Apartment 1. She somehow understood that the Plaintiffs were to vacate Apartment 3 by the end of June. She ended by asking to be apprised of the current timeline of events. Plaintiff 2 responded by asking Lori Wheeler to read the communication between her, Plaintiff 1, and Debra Porter to get a better understanding of where the Plaintiffs were with their living situation. The Plaintiffs reiterated that they were not willing to sign a release of liability and that Defendants 1 and 2 needed to communicate according to the terms of the lease agreement.

83. On July 13, 2022, Defendant 7 and Shelly Trevino banged on Apartment 3 door, even though Apartment 3 had a doorbell. Plaintiff 2 memorialized the event in an email to Lori Wheeler in which she explained that defendant 7 told the Plaintiffs in the presence of others in the hallway that they were illegally squatting in Apartment 3. Defendant 7 wanted the Plaintiffs to sign a Release of Liability and vacate Apartment 3 and aggressively shouted at the Plaintiffs stating that they had no right to be in Apartment 3. Defendant 7 threatened the Plaintiffs with legal action. She said that Apartment 1 was fixed and ready for reoccupation. The Plaintiffs explained to Lori Wheeler that they knew this was untrue since they only fully vacated Apartment 1 on July 8, 2022, and mold was still growing in the toilet, on the tiles above the bath, and on the walls. Defendant 7 said that if the Plaintiffs did not sign the release of liability, they could be held legally liable for Apartment 3. Plaintiff 2 asked Lori Wheeler to let Defendant 7 know that the continuous knocking on Plaintiff's door, issuing vague legal threats, and accusing the Plaintiffs of squatting in Apartment 3 was causing the Plaintiffs extreme anxiety. The Plaintiffs paid their rent and expected peace and quiet and did not accept her verbal threats and abuse. Defendant 7 said that

she was going to rewrite the agreement she was holding in her hand and she was going to get back to the Plaintiffs. The Plaintiffs informed Lori Wheeler to inform Defendant 7 that if the agreement, had a release of liability, the Plaintiffs will not be signing it and to not try and intimidate the Plaintiffs to sign. The Plaintiffs told Lori Wheeler that they told Defendant 7 that they have a valid lease and that she needs to communicate with them the way the lease sets out how proper notice needs to be given. Plaintiff 2 asked Lori Wheeler to please ask Defendant 7 to refrain from threatening Plaintiffs 1 and 3 that they are not on the lease, they had sent evidence from Defendant 2's own computers that they are on the lease. Plaintiff 2 asked Lori Wheeler to ask Defendant 7 to stop saying that the Plaintiffs do not have a lease for Apartment 3, since they were given 306 as a temporary residence as part of the original lease. Plaintiff 2 asked that Defendant 7 stop intimidating the Plaintiffs with regard to this issue. The Plaintiffs told her that they were honoring their part of the lease, even though Apartment 3 was uncomfortable, and that they have been asking for weeks now about their living situation. The Plaintiffs were promised a moving expense by Debra Porter and did not receive it. Debra Porter had previously told the Plaintiffs that they would not be able to move back to 131 at all, contradicting Defendant 7's claim that the Plaintiffs should and could move back to Apartment 1.

84. On July 19, 2022, the Plaintiffs received a certified letter from the Law Offices of R. David Fritsche, stating that the firm represents the Residences and the tenancy at will for Apartment 3 will be terminated on midnight, July 31, 2022. They threatened the Plaintiffs with legal action if they did not move out. The Plaintiffs were asked to communicate with the lawyer and not to contact the Residences.

85. On July 19, 2022, or shortly thereafter, Plaintiff 1 contacted the lawyer by phone and explained that they were given apartment 3 by Debra Porter to use until the end of the lease. The lawyer was not interested in this explanation and said that he will see them in court. He said that the Plaintiffs overplayed their hand by not accepting the offer and moving to Houston. It was very difficult speaking to this lawyer since he did not seem to have researched the situation at all.

86. On July 25, 2022, Plaintiff 1 faxed the lawyer to prevent him from filing an eviction order since the deadline for the lawyer's letter was fast approaching and Plaintiffs were getting very anxious stating that Debra Porter had given Plaintiffs Apartment 3 till the end of the lease.

87. On August 3, 2022, Plaintiff 2 sent an email to Lori Wheeler explaining that the Lawyer was not responding and his non-response was making them very uneasy. The Plaintiffs were scared every time there was a knock on the door. The Plaintiffs got up every day worried that they will be served with an eviction notice. This was really stressful for the Plaintiffs since their future business depended on them securing a lease elsewhere. So, the Plaintiffs decided that they will move out on or before Aug 15, 2022. The Plaintiffs were exercising Debra's second option of terminating the lease early.

88. On August 13, 2022, the Plaintiffs vacated Apartment 3.

89. On August 15, 2022, the Plaintiffs received a check (No.3670) from US MF LC Residences., LLC. for $1,338.12 addressed to all three Plaintiffs which the Plaintiffs believe was the return of the security deposit and pro-rated refund of August rent.

90. It was clear that Defendant 9 agreed to cover the property damage due to water and once it became clear that she needed to cover Additional Living Expenses and Mold Testing under the Mold Exclusion Exception in the policy with a policy

limit of $5,000.00, she tried to influence the Plaintiffs to settle the mold claim with the Water Damage claim. She said that if the Plaintiffs wanted to claim for mold the Plaintiffs would only get the limit of $5,000.00 and it would be better for the Plaintiffs to just claim under the water section of the claim. Plaintiff 1 alleges that even after Defendant 9 was confronted with the facts in the policy, she continued to misrepresent the policy by stating that both the water-damaged contents and the mold-damaged contents will have a policy limit of $5,000.00.

91. The Plaintiffs allege that Defendant 9 and Defendant 8 negotiated in bad faith and violated Texas Insurance Code, Title 5, Subtitle C, Chapter 541, Sec 541.060 (a) 1, 2 A and B, and 3, 7. Specifically, the Plaintiffs allege that Defendant 9 misrepresented the coverage, failed to attempt in good faith to settle the claim, closed the claim without a reasonable explanation, and refused to pay the claim without conducting a reasonable investigation.

92. As a result of the Defendant s' actions and/or inactions, the Plaintiffs were exposed to dangerous mold for many months and suffered significant damages, including loss of personal property, personal injury, and other expenses.

## COUNT I: BREACH OF CONTRACT

93. The Plaintiffs re-allege and incorporate by reference herein all of the allegations contained in paragraphs 1-92 above.

94. That on or about March 23, 2022, and thereafter, the Defendants by and through their employees/servant/agents breached the contracts and failed to meet their obligations and duties owed to the Plaintiffs as a tenant, which caused the Plaintiffs' injury and loss of property.

95. That as a direct result of the breaches by the Defendants, by and through its agents, and employees, resulting in the losses, the Plaintiffs sustained those damages to include but not limited to, mental anguish, emotional pain and suffering, and loss of property.

## COUNT II: GROSS NEGLIGENCE

96. The Plaintiffs re-allege and incorporate by reference herein all of the allegations contained in paragraphs 1-95 above.

97. During the very first call with Defendant 9, she said that since the water was on the ground, groundwater was not a covered cause of loss. Plaintiff alleges that once Defendant 9 heard Plaintiff's Accent, she tried to confuse water on the ground as water originating from underground and summarily closed the claim. The Plaintiffs allege that Defendant 9, in so doing, discriminated against them based on their country of origin.

98. The Plaintiffs allege that Defendant 9 stating that she was going to send out vendors for water and mold damage assessment was more a bullying tactic than a genuine concern for the Plaintiffs and once the Plaintiffs welcomed the action, Defendant 9 decided against it. The Plaintiffs also allege that Defendant 9's failure to send out a mold inspector, resulted in Defendant 1 and Defendant 2 not taking the Plaintiffs' situation seriously.

99. Defendant 9 did not contact the apartment manager to determine the source of the water leak and only spoke to her when Plaintiff 1 connected them via his cell phone and further went ahead and closed the claim without finding out the correct facts and failed to contact the Plaintiffs to find out if they found out where the leak originated from.

100.     Defendant 9 did not attempt to find coverage and further failed to call back to explain why she was closing the claim.

101.    The Plaintiffs allege that due to the Bulls Eye 1.2.3 Pro spray, the room became very toxic for Plaintiffs 1 and 2 and they could not sleep in it for a few days. They slept on the couch in the living room. Plaintiffs 1 and 2 kept pleading with Shelly Trevino and Debra Porter to accommodate them in the model apartment but they refused to do so. There were back-and-forth emails that show that the Plaintiffs asked for help to be relocated and Shelly Trevino kept insisting that the Plaintiffs get help from Defendant 8 even after being told many times that they refused the mold claim.

102.    That as a direct result of the breaches by the Defendants, by and through its agents, and employees, resulting in the losses, the Plaintiffs sustained those damages to include but not limited to, mental anguish, emotional pain and suffering, and loss of property.

## COUNT III: MISREPRESENTATION

103.    The Plaintiffs re-allege and incorporate by reference herein all of the allegations contained in paragraphs 1-102 above.

104.    Defendant 8's claims adjuster knew or should have known that mold was covered and was grossly incompetent or lied that it was not covered.

105.    Defendant 8's claims adjuster misrepresented to the Plaintiffs a material fact or policy provision relating to coverage at issue.

106.    Defendant 8's claims adjuster failed to attempt in good faith to effectuate a prompt, fair, and equitable settlement of the claim.

107.    The Plaintiffs allege that Defendant 4 came to Apartment 1 and opened up the master bedroom wall and made the situation much worse. Plaintiff 1 told Defendant 4 to call him after he had opened the wall and before he did any remediation. Defendant 4 called Plaintiff 1 and stated that there was no visible mold inside the bedroom wall. Plaintiff 1 could not confirm his observations

since everything was covered in white dust from the use of an electric saw. Defendant 4 sprayed the master bedroom frame with Bulls Eye 1.2.3 Pro which was very toxic to the Plaintiffs. Defendant 4 opened the Master Closet walls and only called Plaintiff 2 to look at the frame after he had sprayed it with Bulls Eye 1.2.3 Pro.  It seemed to Plaintiff 2 that Defendant 4 found black mold in the closet and sprayed Bulls Eye 1.2.3 Pro to cover it up. Plaintiff 1 noticed that the backs of the exposed sheetrock were black when Defendant 4 and his crew carried the unfastened drywall out of the apartment. Defendant 4 did not follow any of Craig Nelson's recommendations. Defendants 3 and 4 were not licensed to carry out mold inspections and/or remediation.

108.    The Defendants' claim misrepresented to the Plaintiffs the material facts relating to the condition and state of the apartment.

109.    That as a direct result of the breaches by the Defendants, by and through its agents, and employees, resulting in the losses, the Plaintiffs sustained those damages to include but not limited to, mental anguish, emotional pain and suffering, and loss of property.

## COUNT IV: DEFAMATION- Slander Per Se

110.    The Plaintiffs re-allege and incorporate by reference herein all of the allegations contained in paragraphs 1-109 above.

111.    The Plaintiffs allege that Defendant 7 defamed their character by making a defamatory statement while referring to the Plaintiffs' that they were illegally squatting, statements that Defendant 7 knew to be false and to damage the Plaintiffs' character.

112.    The Plaintiffs maintain that they were rightfully in the apartment and were never squatters.

113.    Defendant 7 false and negligent statements have caused significant harm to the Plaintiffs' reputation.

114.    Due to Defendant 7's false statements regarding the Plaintiffs to other potential Landlords and the public at large, the Plaintiffs have suffered emotional distress, and harm to their reputations.

### COUNT V: CIVIL CONSPIRACY TO COMMIT FRAUD - (Common Law)

115.    Plaintiff incorporates by reference and realleges incorporate by reference herein all of the allegations set forth above.

116.    Common law makes it unlawful for "any two or more persons who combine, associate, agree, mutually undertake or concert together for the purpose of (i) willfully and maliciously injuring another in his reputation, trade, business or profession by any means whatsoever or (ii) willfully and maliciously compelling another to do or perform any act against his will, or preventing or hindering another from doing or performing any lawful act."

117.    At all relevant times, the Plaintiffs allege that the Defendants agreed to and did conspire to willfully and maliciously injure the Plaintiffs.

118.    The Plaintiffs allege that Defendant 6 and Defendant 2, knowingly, willfully, and intentionally conspired and agreed to conduct and participate in the conduct of the affairs and worked together to get a lower result on the test as alleged in the preceding section and the Plaintiffs suffered serious harm as a result of Defendants' conduct and conspiracy.

119.    As a direct and proximate consequence of the Defendants' conspiracy, Plaintiff has been injured, causing Plaintiff to suffer monetary damages, said damages to be proven at the time of trial.

120.    Defendants' conduct as alleged above was done in furtherance of their own private interests, and was willful, malicious, wanton, and oppressive, and

done with conscious and callous indifference to the consequences and with the specific intent to harm.  Accordingly, the Plaintiffs are entitled to an award of punitive damages from Defendants and each of them in an amount to be proven at trial and sufficient to punish, penalize and deter Defendants from engaging in such conduct in the future.

## DAMAGES

121.    As a result of the Defendants' actions, the Plaintiffs were exposed to dangerous mold for many months and suffered significant damages, including loss of personal property, personal injury, and other expenses.

122.    Defendants' actions on the Plaintiffs were done with the knowledge of their effects and with reckless disregard as to their truth.  As a direct and proximate result of the actions of the Defendants, Plaintiff has suffered monetary and emotional damages.

123.    The Plaintiffs have been subjected to suffering, injury, and loss for which the Plaintiffs should be awarded damages in an amount as may be shown by the evidence.

124.    The conduct of Defendant's representatives was intentionally harmful and malicious, and should be fined with punitive and exemplary damages to cause them to refrain from such malicious conduct in the future and to deter others from engaging in similar conduct.

125.    The Plaintiffs request Special Damages from Defendants for the losses and expenses incurred as a result of the Defendants' actions, negligence and misconduct.  Plaintiff seeks compensation in the amount:

    a.  Contents of Apartment, Total Loss. - **$60,000.00**

    b.  Contents of the Plaintiffs' Storage, diminished value/total loss- **$30,000.00**

    c. Medical practitioners and laboratory costs. - **$5,000.00**

    d. Cost of the Florida Trip and loss of enjoyment. - **$30,000.00**

    e. **Loss of Business Opportunity-$300,000.00**

    f. **Past and Future Additional Living Expenses-$350,000.00**

          **TOTAL SPECIAL DAMAGES= $775,000.00**

126.     The Plaintiffs requests General Damages from Defendants to be determined by the court, caused by Defendants actions, negligence and misconduct for:

    a. The incurred pain and suffering

    b. Personal Injury to Plaintiff 1 who has been diagnosed with Chronic Inflammatory Response Syndrome and is projected to suffer with this condition for another forty-eight years.

    c. Personal Injury to Plaintiff 2 who has been diagnosed with Chronic Inflammatory Response Syndrome and is projected to suffer with this condition for another fifty-two years

    d. Personal Injury to Plaintiff 3 who has been diagnosed with Chronic Inflammatory Response Syndrome and is projected to suffer with this condition for another twenty-four years.

    e. Discrimination based on country of origin.

    f. Mental Anguish,

## RELIEF REQUESTED

**WHEREFORE:** The Plaintiffs Vince Chetty, Denise Chetty; and Angela Govender, claim monetary damages against the Defendants in an amount specifically pleaded, general damages to be determined at trial, plus costs, and for any further relief that this Honorable Court determines necessary and appropriate.

Dated: _March 14, 2023_

Respectfully submitted,

Vince Chetty: _Vince Chetty_

Denise Chetty: _Denise Chetty_

Angela Govender: _Angela Govender by Vince Chetty POA_

2725 Arbor Edge Crossing, La Marque, Texas 77568.

vchetty@msn.com

(909) 579-7118.

*Pro Se*